**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| THEODORE H. COMINOS, <br><br> Plaintiff, <br><br> v. <br><br> FREEDOM SPECIALTY INSURANCE COMPANY, <br><br> Defendant. | Case No. 18-cv-02070-BLF <br><br> **ORDER DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> [Re: ECF 28, 29] |

In this action, Plaintiff Theodore H. Cominos sues Defendant Freedom Specialty Insurance Company for Defendant's alleged breach of its duty to defend Plaintiff in an underlying action as set forth in a legal professional services policy issued by Defendant to Plaintiff. Before the Court are the parties' motions for summary judgment. Def. Mot., ECF 28; Pl. Mot., ECF 29. The Court heard oral argument on these motions on April 4, 2019. For the reasons stated herein, Defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART. Plaintiff's cross motion for partial summary judgment is DENIED.

## I. BACKGROUND[1]

### A. The Underlying Action

On January 29, 2016, Richard MacDonald, Richard MacDonald Studios, Inc., Richele Fine Art, Inc., Richard D. MacDonald Family Partnership, LLP, and Hudson LV, LLC (collectively, "MacDonald") filed in Monterey County Superior Court the underlying action titled *Richard MacDonald, et al. v. Julia Cominos, et al.*, Monterey County Superior Court, Case No. 16-CV-

---

[1] The facts set forth in this section are undisputed unless otherwise noted.

000320 (the "MacDonald Action"). Cominos Decl., Ex. B ("MacDonald Compl."), ECF 31. Richard MacDonald is a sculptor whose then-wife Julia Cominos ("Julia") helped him manage his various art companies. MacDonald Compl. ¶¶ 1, 4, 16. At the heart of the MacDonald Action are MacDonald's allegations that Julia "financially abuse[d] and defraud[ed] Plaintiffs," by misappropriating and stealing millions of dollars from MacDonald. *Id.* ¶¶ 17, 22; *see, e.g.*, *id.* ¶¶ 23–31. As a result of these actions, MacDonald sued Julia, her father Theodore H. Cominos (Plaintiff, here) ("Plaintiff" or "Cominos"), the Theodore Cominos Sr. Family Trust ("Trust"), whose members include Julia and Cominos, *id.* ¶¶ 5–6, various financial institutions and accountants, and a few employees of MacDonald's. *See id.* ¶¶ 7–13, 23–25, 32–33. MacDonald brought 18 state-law claims against these defendants in various combinations. The Court discusses the claims relevant to this action below.

As is relevant here, one means by which Julia allegedly misappropriated funds was by diverting payments to "a property management company wholly owned by the Cominos family," including Plaintiff and the Trust, and by making a payment "directly to Defendant Theodore Cominos Sr.'s law offices." *Id.* ¶ 31. MacDonald brought the following causes of action against Cominos: (1) negligence and professional negligence; (2) elder abuse; (3) constructive trust; (4) receipt/concealment of stolen property in violation of Cal. Penal Code § 496; (5) civil conspiracy; (6) unjust enrichment; (7) violation of Cal. Bus. & Prof. Code § 17200, *et seq.* ("UCL"); and (8) injunctive relief. *Id.* ¶¶ 34–39, 81–96, 105–12, 123–28, 129–31.

The professional negligence claim alleges that the defendants "owed Plaintiff a duty to act with reasonable and ordinary care and skill with respect to the various financial affairs of Plaintiffs" and "breached their duties of care by failing to adequately manage and/or safeguard Plaintiffs' financial affairs." *Id.* ¶¶ 35, 37. This claim specifically references two accountant defendants only, not Cominos, but it is brought against all defendants. *See id.* ¶¶ 34–39. The receipt of stolen property claim alleged that the defendants "concealed, withheld and/or received monies belonging to Plaintiffs knowing the monies had been stolen or obtained in a manner constituting theft." *Id.* ¶ 94. The civil conspiracy cause of action alleged that each defendant "was aware of each other Defendant's plans to commit" the allegedly unlawful acts, and that each

defendant "agreed with each other Defendant and intended that some and/or all of the wrongful acts set forth in this Complaint occur and be accomplished." *Id.* ¶¶ 106–07. And finally, the UCL claim alleged that each defendant engaged in unlawful and unfair business practices including "facilitating and conspiring with Julia Cominos in the misuse of Plaintiffs' personal and business funds and lines of credit. *Id.* ¶ 125.

The MacDonald Complaint does not specifically identify Plaintiff as an attorney, *see id.* ¶ 5, and it does not allege that Plaintiff ever provided professional legal services to MacDonald or to Julia. *See generally id.*

**B.    The Policy**

This action concerns Lawyers Professional Liability Insurance Policy no. LGF0001294 issued by Defendant to The Law Offices of Theodore H. Cominos and effective September 19, 2015 to September 19, 2016 (the "Policy"). *See* Grant. Decl., Ex. A ("Policy"), ECF 28-1. The Policy sets forth the scope of the agreement and Defendant's duty to defend Plaintiff in certain actions in relevant part as follows:

I.    INSURING AGREEMENT

A.    Coverage

This policy will pay on your behalf, loss arising from a claim first made against you during the policy period and reported in writing to us during the policy period or, if applicable, the extended reporting period pursuant to the terms of this policy for any actual or alleged covered act whenever or wherever such covered act has been committed by:

1. you in rendering or failure to render professional services for others; and

…

B.    Defense and Settlement:

We have the right and duty to defend, subject to and as part of the Limits of Liability, any claim made against you during the policy period and reported in writing to us during the policy period or, if applicable, the extended reporting period pursuant to the terms of this policy for any actual or alleged covered act for which coverage is afforded under this policy, even if any of the allegations of the claim are groundless, false, or fraudulent.

…

Policy at FREEDOM_PROD_000012–13 (emphases omitted). The Policy also sets forth the following relevant definitions:

3

IV. DEFINITIONS

C. Claim means:

1. a written or verbal demand for money or services;

…

F. Controlling interest means the right, directly, or indirectly, to (a) vote thirty percent (30%) or more of the issued and outstanding voting stock in an incorporated entity, (b) elect thirty percent (30%) or more of the directors of an incorporated entity, (c) receive thirty percent (30%) or more of the profits of an unincorporated entity, or (d) have the position of general partner of a limited partnership, managing general partner of a general partnership, or comparable position in any other business enterprise.

…

G. Covered act means an act, error, or omission, including breach of contract or duty, breach of fiduciary duty or personal injury arising from professional services performed by any of you.

…

O. Fiduciary, except in EXCLUSION V.D., means you in your capacity as an administrator, conservator, executor, guardian, committee of an incompetent, trustee, receiver, escrow agent, including appointed by a court of law, or any similar capacity but only in the course of rendering or failure to render professional services for others.

…

Q. Loss means damages, judgments, settlements, client notification and consultant costs, and defense costs which you are legally obligated to pay; provided, however, that loss does not include fines, penalties, sanctions, taxes, or exemplary damages, the multiple portion of multiplied damages, reimbursement, disgorgement, reduction, set-off, or return of fees, costs, or expenses, any amount for which you are not financially liable or for which is without legal recourse to you, or matters which may be deemed uninsurable under the law pursuant to which this policy is construed.

R. Named insured means the individual, partnership, or firm engaged in the practice of law under the name stated in Item 1. of the Declarations and its predecessor practice, if any.

…

Z. Professional services means legal and consulting services and activities performed by you for others provided that the remuneration for such services or advice, or a portion thereof, inures to your benefit:

1. performed as a lawyer, notary public, arbitrator, mediator, title insurance agent, designated issuing lawyer to a title insurance company, fiduciary, speaker or author of legal treatises;

2. provided by a lawyer in connection with any bar association, its governing

4

board, or any of its committees;

3. the publication or presentation of research papers or similar materials by you;

4. provided in connection with pro bono representation; or

5. provided by your employee in connection with assisting a lawyer to perform the activities described in 1., 2., 3. and 4. above for others on the behalf of you.

…

Policy at FREEDOM_PROD_000016–20 (emphases omitted). Finally, the Policy sets forth the following relevant exclusions:

V. EXCLUSIONS

This policy excludes coverage for any loss in connection with a claim:

…

C. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving activities performed by you in connection with a trust or estate if you are a beneficiary or distributee of the trust or estate;

…

E. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving a covered act committed by you in connection with any business enterprise which is not the named insured if, at the time of such covered act any of you, had a controlling interest in such business enterprise. This exclusion applies whether or not a lawyer-client relationship existed;

…

G. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving bodily injury, sickness, disease, death, mental anguish, emotional distress, or humiliation to any person. However, this exclusion does not apply to mental anguish, emotional distress, or humiliation solely caused by personal injury;

…

Policy at FREEDOM_PROD_000020–21 (emphases omitted).

**C.     The Tender of Defense**

On February 8, 2016, Plaintiff reported the MacDonald Action to Defendant by submitting a Claim/Incident Notification Form along with the MacDonald Complaint. *See* Grant. Decl, Ex. B., ECF 28-1. In the Notification, Plaintiff gave the following brief description of the MacDonald Complaint allegations: "Claim for damages for transfer of funds of defendant to account of insured

5

law firm which funds were kept by insured for a period of a few days and refunded in their entirety to defendant; no funds belonging to defendant were kept by insured." *Id.* at FREEDOM_PROD_000042. The same day, Defendant acknowledged receipt of the claim. *Id.*, Ex. C, ECF 28-1.

On February 9, 2016, Plaintiff spoke on the telephone with a claim representative of Defendant's. Cominos Decl. ¶ 11, ECF 31. Plaintiff informed the claim representative of additional facts relating to the MacDonald Action. Specifically, Plaintiff told the claim representative the following[2]: Richard MacDonald had forced his wife (Plaintiff's daughter) Julia out of their home and prevented her from using any of the family finances or from accessing her marital community property. *Id.* ¶ 6; *see also* Ebey Decl. ISO Opp., Ex. F, ECF 35-1 (Defendant's claim file notes). Julia then checked MacDonald's business books and realized she was owed unpaid earnings, so she prepared business checks to herself. Cominos Decl. ¶ 6. Julia then "sought [Plaintiff's] legal advice and assistance regarding her community property rights [and] her rights as an employee to receive prompt payment of unpaid wages and protecting her money." *Id.* ¶ 7; *see also* Ebey Opp. Decl., Ex. F. Plaintiff "counseled her on these issues and provided the requested legal advice and assistance to [his] daughter on a pro bono basis." Julia then deposited her own money into Plaintiff's law firm account "for safekeeping," and then requested that Plaintiff withdraw it for her a few days later. Cominos Decl. ¶ 7. Defendant's claim-file notes confirm that Plaintiff discussed these details with the claim representative, and state that Plaintiff "indicates that the only legal services he provided was to 'counsel his daughter' re said matters, but payment to firm was not meant as reimbursement for his legal services." Ebey Opp. Decl., Ex. F.

On February 24, 2016, the claim representative made the following note in the claim file:

Based on info currently available, it does not appear the complaint triggers the Insuring Agreement because the alleged wrongful conduct by insured does not arise from the Insured's rendering or failing to render professional services. Insured

---

[2] At the hearing on the motions, Defendant's attorney indicated that the facts of what was discussed on the phone call are disputed. However, Defendant does not offer any evidence to refute Plaintiff's characterization of the conversation. And, as discussed below, the Court overrules Defendant's evidentiary objections to this evidence.

accepted transfer of stolen and/or misappropriated funds due to relationship with his daughter, not b/c of any legal services he was providing. Complaint does contain COA for Professional Negligence, but the COA appears to be directed at Plaintiff's accountants, Bianchi Kasavan & Pope LLP and Carla Hudson.

On March 15, 2016, after evaluating the potential for coverage, Defendant informed Plaintiff that it declined to cover the MacDonald Action. *See* Grant Decl., Ex. D, ECF 28-1. Defendant denied coverage because it had concluded that the MacDonald Action did not relate to any "covered act" under the Policy—namely, Plaintiff's provision of professional services. *Id.* at FREEDOM_PROD_000083. Specifically, Defendant stated that the allegations "appear to arise solely from [Plaintiff's] alleged acceptance of misappropriated and/or stolen funds," as opposed to alleging "that [Plaintiff] provided any professional services in connection with the matter." *Id.* As to the Professional Negligence claim, Defendant believed that the claim applied specifically to the accountant defendants, not to Plaintiff. Ultimately, "[b]ased on information currently available, [Plaintiff's] alleged wrongful conduct in accepting stolen or misappropriated funds from [his] daughter, Julia Cominos, did not involve [his] rendering or failing to render professional services." *Id.* (emphasis omitted). As such, Defendant concluded that the MacDonald Action did not trigger the Policy. *Id.* Plaintiff accepted this denial of coverage. Cominos Decl. ¶ 13.

Over a year and a half later, on December 7, 2017, Plaintiff's attorney Frederick Ebey sent a letter to Defendant objecting to the denial of coverage because Defendant "gave an unreasonably narrow interpretation of the allegations of the [MacDonald] complaint when it denied coverage." Grant Decl., Ex. E, ECF 28-1. Specifically, Mr. Ebey argued that the MacDonald Complaint's professional negligence claim applied more broadly than to just the accountant defendants, that the MacDonald Complaint alleged that Cominos failed to safeguard MacDonald's financial affairs, and that Cominos represented his daughter pro bono with respect to her community property rights, each of which triggered the duty to defend under the Policy. *Id.* at FREEDOM_PROD_000095. Defendant did not respond to this letter within 30 days, so Mr. Ebey followed up with another letter on January 22, 2018 and a phone call on February 2, 2018. *See* Ebey Decl. ISO Pl. Mot. ("Ebey Mot. Decl.") ¶¶ 8–9 & Ex. B, ECF 32.

On February 5, 2018, Defendant again denied coverage, listing many of the same reasons as in its previous denial. *Id.*, Ex. F, ECF 28-1. With respect to Plaintiff's alleged pro bono

representation of his daughter, Defendant noted that Plaintiff had submitted no evidence of this representation, that the Complaint made no mention of anything relating to such representation or of any potential loss based on that representation, and that Plaintiff was merely speculating about claims that MacDonald might bring. *Id.* at FREEDOM_PROD_0000107 & n.4. On February 8, 2018, Mr. Ebey responded to this second denial, emphasizing in his rebuttal that the MacDonald Complaint references deposits made into Cominos's law firm's account, that Cominos need not have provided financial services *to* MacDonald in order to be covered by the Policy, and that the MacDonald Complaint alleged Cominos owed a duty to MacDonald to protect his funds. *See generally id.*, Ex. G, ECF 28-1.

> **D.** **The Present Action**

Plaintiff filed this action on March 7, 2018 in the Monterey County Superior Court of California. ECF 1. In his Complaint, Plaintiff alleges that Defendant breached the Policy by failing to defend him in the MacDonald Action. *See generally* Compl., ECF 1 at 8–14. Plaintiff also brings a cause of action for violation of the implied covenant of good faith and fair dealing ("GFFD") based on Defendant's alleged unreasonable and bad faith decision not to defend Plaintiff. *Id.* Defendant removed the case to this Court on April 5, 2018. ECF 1.

## II. EVIDENTIARY OBJECTIONS

Defendant objects to certain pieces of evidence submitted in support of Plaintiff's motion for summary judgment. *See* Def. Opp. at 19–23, ECF 34. The Court discusses each objection in turn.

> **1.** **Ebey Declaration ISO MSJ – Characterizations of MacDonald Complaint**

Defendant objects to paragraphs 2, 3, and 6 of Plaintiff's attorney Frederick H. Ebey's declaration because Defendant believes Mr. Ebey's opinions about and restatements of the MacDonald Complaint are irrelevant (under Federal Rule of Evidence ("Rule") 401), lack foundation (under Rule 104(b)), and do not represent the best evidence of the MacDonald Complaint (under Rule 1002). *See* Def. Opp. at 19–20.

<u>Ruling</u>: SUSTAINED. The allegations from the MacDonald Complaint speak for themselves, and Mr. Ebey's interpretation of the Complaint as being "complex," having a certain

"main focus," or being subject to broad interpretation lack foundation and are not the best evidence of the contents of the complaint.

### 2. Ebey Declaration ISO MSJ – Alleged Conclusions of Law

Defendant objects to paragraphs 5–8 and 10–12 of Mr. Ebey's declaration because Defendant believes Mr. Ebey improperly states legal conclusions under Rules 702 and 703 by interpreting the Policy and drawing conclusions about the reasonableness of Defendant's handling of Plaintiff's claim. *See* Def. Opp. at 21.

Ruling: OVERRULED. Reading the challenged paragraphs in the context of the declaration makes clear that they are introduced only to detail the information shared with Defendant by Mr. Ebey on Plaintiff's behalf regarding Mr. Ebey's belief that Defendant had a duty to defend Plaintiff. To the extent these paragraphs can be interpreted to be legal conclusions, the Court agrees that Mr. Ebey has not demonstrated that he has the proper qualifications to make such conclusions.

### 3. Ebey Declaration ISO MSJ, Ex. E – Evidence of Settlement Discussions

Defendant objects to Plaintiff's submission of information regarding the parties' settlement discussions because they are irrelevant (under Rules 401 and 402) and protected by the settlement privilege (Rule 408).

Ruling: SUSTAINED. The evidence is inadmissible under Rule 408 because Plaintiff introduces it to prove the validity of his good faith and fair dealing claim. *See* Pl. Memo. at 13, ECF 30.

### 4. Cominos Declaration ¶ 6

In his declaration, Cominos Decl., ECF 31, Plaintiff Cominos states:

My daughter, Julia Cominos, was married to Richard MacDonald for a number of years. During their marriage and prior thereto, my daughter, Julia Cominos, who has an MBA degree, worked as the executive vice president for all of Mr. MacDonald's businesses arising from his successful career as a sculptor. On or about December 23, 2014, Mr. MacDonald abruptly forced Julia Cominos to leave their family home which he owned, and immediately prevented her from using any of their family bank accounts and credit cards and fired her from her job. Ms. Cominos needed funds to live on since her access to all of her community property had been cut off so she checked the books of her husband's businesses and found she had unpaid earnings

due her of approximately $350,000. She then prepared business checks to herself which were signed with her husband's signature stamp that she had previously been authorized to and had used.

Defendant objects to this paragraph as irrelevant (Rules 401 and 402) to the question of whether Defendant had a duty to defend, not supported by sufficient facts (Rule 104(b)), and not clearly made based on Plaintiff's personal knowledge (Rule 602). And to the extent any of this information is based on information provided to Plaintiff by his daughter, it constitutes inadmissible hearsay (Rule 802).

<u>Ruling</u>: OVERRULED. The Court has no reason to believe that, as Julia's father, Plaintiff would not have personal knowledge of the events occurring in Julia's life. These facts are relevant to Plaintiff's assertion that he provided Julia with pro bono legal services regarding these actions. And the paragraph does not contain any hearsay, as it does not attribute any out-of-court statement to anyone.

### 5. Cominos Declaration ¶¶ 7, 11

In his declaration, Plaintiff Cominos states the following at paragraphs 7 and 11:

7. Julia Cominos then sought my legal advice and assistance regarding her community property rights, her rights as an employee to receive prompt payment of unpaid wages and protecting her money. I counseled her on these issues and provided the requested legal advice and assistance to my daughter on a pro bono basis. She then sent me a total of $141,00[0] for safekeeping which was deposited in my law firm trust account. The funds were deposited in the trust account because they were the funds of Ms. Cominos, not the law firm. A few days later she requested that the $141,000 be withdrawn from our trust account and the funds were promptly returned to my daughter.

…

11. On February 9, 2016 I had a short telephone conversation with Jason Grant, the claims representative for Freedom Specialty Insurance Company who was responsible for handling my claim, where we reviewed the allegations of the complaint and I advised Mr. Grant, among other things, that my daughter, Julia Cominos, was going through a divorce proceeding with her husband, plaintiff Richard MacDonald and the civil action had been filed in an attempt to intimidate my daughter. I stated that my daughter had been literally thrown out of the home she lived in with her husband who had also cut off her access to credit cards and funds. I then responded to the questions of Mr. Grant and provided him with the information set forth in paragraphs 6 and 7 above.

Defendant objects to these paragraphs as lacking foundation (Rule 104(b)) and as

contradicted by Defendant's evidence, thus raising credibility issues. It also objects to Plaintiff's testimony in paragraph 11 with respect to his daughter's divorce proceedings as being irrelevant.

<u>Ruling</u>: OVERRULED. The Court does not make credibility determinations at summary judgment, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986), and Plaintiff has personal knowledge about his interactions with his daughter and Mr. Grant. The existence of divorce proceedings is relevant to Plaintiff's assertion that he provided pro bono representation to his daughter regarding her community property rights.

### III.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)).

The moving party seeking summary judgment bears the burden of showing there is no material factual dispute. Once the moving party has satisfied this initial burden, the non-moving party must then "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996); *see also Schneider v. TRW, Inc.*, 938 F.3d 986, 991 (9th Cir. 1990). It is not the duty of the district court to "to scour the record in search of a genuine issue of triable fact." *Keenan*, 91 F.3d at 1279 (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)). Moreover, the court makes no credibility determinations and does not weigh the evidence. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 254; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). For a court to find that a genuine dispute of material fact exists, "there must be enough doubt for a reasonable trier of fact to find for the [non-moving party]." *Corales v. Bennett*, 567 F.3d 554, 562 (9th Cir. 2009). If the non-moving party fails to make this showing, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

The filing of cross-motions for summary judgment or partial summary judgment does not

mean that the material facts are undisputed, and the denial of one motion does not necessarily require the granting of the other. *See, e.g., Regents of Univ. of Calif. v. Micro Therapeutics, Inc.*, 507 F. Supp. 2d 1074, 1077–78 (N.D. Cal. 2007) (citing *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1147 (10th Cir. 2000). The cross-motions are to be evaluated in accordance with the requisite burden of proof facing each party. *Id.* at 1078.

## IV.  DISCUSSION

The parties filed cross-motions for summary judgment. Defendant seeks summary adjudication as to both claims, and as to Plaintiff's request for punitive damages. *See* Def. Mot. at 1. Plaintiff seeks summary judgment only as to his GFFD claim. ECF 29 at 1. There can be no breach of the implied covenant of GFFD without a breach of the insurance contract. *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 36, 900 P.2d 619, 639 (1995), *as modified on denial of reh'g* (Oct. 26, 1995). As such, because Plaintiff does not move for summary judgment as to liability on his breach of contract claim, he cannot secure summary judgment on his GFFD claim. This reason alone warrants denial of Plaintiff's motion.[3]

In any event, as discussed below, the Court finds that summary judgment is not appropriate as to either claim. However, summary judgment is warranted for Defendant as to punitive damages. Because the briefing is somewhat similar on both motions, the Court primarily addresses Defendant's motion and Plaintiff's opposition thereto, incorporating where necessary argument contained in the briefing related to Plaintiff's motion.

As stated, Defendant moves for summary judgment on both claims and Plaintiff's punitive damages request. The Court discusses each issue in turn.

### A.  Breach of Contract

Plaintiff's breach of contract claim is based on Defendant's alleged failure to defend Plaintiff in the MacDonald Action, despite its contractual obligation to do so. The Court first discusses the relevant law and then discusses Defendant's arguments.

---

[3] Defendant also argues the Court should deny Plaintiff's motion because it was not timely filed. *See* Def. Opp. at 7. Because the Court denies the motion for other reasons, it does not address the timeliness of the filing.

### 1. Duty to Defend Law

"[T]he duty to defend in California is extensive." *Hudson Ins. Co. v. Colony Ins. Co.*, 624 F.3d 1264, 1267 (9th Cir. 2010). An insurer's duty to defend arises when a third party "*potentially* seeks damages within the coverage of the policy." *Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 275 (1966) (emphasis in original). "Implicit in this rule is the principle that the duty to defend is broader than the duty to indemnify; an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded." *Horace Mann Ins. Co. v. Barbara B.*, 4 Cal. 4th 1076, 1081 (1993). Given the breadth of the duty to defend, an insured in an action concerning a duty to defend "need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot*." *Montrose Chem. Corp. v. Superior Court*, 6 Cal. 4th 287, 300 (1993) (emphasis in original); *see Hartford Cas. Ins. Co. v. Swift Distribution, Inc.*, 59 Cal. 4th 277, 288 (2014). If a potential cause of action is shown for one covered claim, the insurer has a duty to defend all claims asserted against the insured, "regardless of whether the other claims were covered under the policy." *Hudson Ins.*, 624 F.3d at 1267 (citing *CNA Cas. of Cal. v. Seaboard Sur. Co.*, 176 Cal. App. 3d 598, 612 n.7 (1986)).

To determine whether a duty to defend exists, courts compare the terms of the policy with the allegations in the third party complaint, along with any extrinsic facts known to the insurer at the time of tender, to see whether "the allegations on the face of the third party complaint, and . . . extrinsic information available to [the insurer] at the time" indicate a potential for coverage. *Gunderson v. Fire Ins. Exchange*, 37 Cal. App. 4th 1106, 1114 (1995). As articulated by the California Supreme Court, "[i]f any facts stated or fairly inferable in the complaint, or otherwise known or discovered by the insurer, suggest a claim potentially covered by the policy, the insurer's duty to defend arises and is not extinguished until the insurer negates all facts suggesting potential coverage." *Scottsdale Ins. Co. v. MV Transp.*, 36 Cal. 4th 643, 655 (2005). "Any ambiguity in the insurance policy, including in the exclusions, must be resolved in favor of finding coverage." *Hudson Ins.*, 624 F.3d at 1267; *see also Montrose*, 6 Cal. 4th at 299–300. On the other hand, the duty to defend, though broad, cannot be founded in "speculat[ion] about extraneous 'facts' regarding potential liability or ways in which the third party claimant might

amend its complaint at some future date." *Gunderson*, 37 Cal. App. 4th at 1114. Rather, a court's determination of a duty to defend is guided by established principles of contract interpretation and the "nature and kinds of risks covered by the policy." *Hartford Cas. Ins.*, 59 Cal. 4th at 288 (quoting *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal. 4th 1, 19 (1995)).

### 2. Defendant's Arguments

Defendant asserts two overarching arguments: (1) "Cominos cannot meet his burden to establish that allegations in the [MacDonald] Action were potentially covered under the Policy as required to trigger Freedom Specialty's duty to defend"; and (2) even if the Policy could cover the MacDonald Action, "exclusions in the Policy . . . eliminate any potential for coverage." Def. Mot. at 12. The Court discusses each argument in turn.

#### a. The *MacDonald* Complaint and the Extrinsic Evidence Demonstrated a Potential for Coverage

Defendant's most extensive argument is that no reasonable juror could determine that the MacDonald Complaint alleged "any potentially covered claim for a covered act" under the Policy or that Plaintiff's extrinsic evidence of his "purported pro bono representation" of his daughter changes this analysis. *Id.* at 12; *see id.* at 12–19. The Court disagrees.

To determine coverage, the Court first looks to the Policy. The Policy covers, in relevant part, "loss arising from a claim . . . for any actual or alleged covered act . . . committed by: 1. you in rendering or failure to render professional services for others." Policy at FREEDOM_PROD_ 000012–13. The Policy defines professional services as "legal and consulting services and activities performed by you for others provided that the remuneration for such services or advice, or a portion thereof, inures to your benefit: . . . 4. provided in connection with pro bono representation." *Id.* at FREEDOM_PROD_000019.

A reasonable jury could conclude that the extrinsic evidence, in combination with the allegations in the MacDonald Complaint, demonstrates that Defendant had a duty to defend Plaintiff in the MacDonald Action because the underlying claims "*may* [have] fall[en] within policy coverage." *Montrose*, 6 Cal. 4th at 300 (1993).

As an initial matter, the Court agrees with Defendant that the MacDonald Complaint on its

own does not allege any potential coverage—there are no allegations that Plaintiff provided legal services to anyone, that the case relates to any such services, or that the complaint relates to anything other than Julia's (and her accountants' and banks') misappropriation and/or mishandling of MacDonald's funds. *See* Def. Mot. 12–15. But the Court must also look to the extrinsic evidence known to the insurer at the time of tender. *See Gunderson*, 37 Cal. App. 4th at 1114; *Montrose*, 6 Cal. 4th at 295 ("Facts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy."). In this case, Plaintiff's conversation with Defendant's claim representative is the linchpin to finding potential coverage. Plaintiff told Defendant that in the face of Julia's marital disputes with MacDonald, Plaintiff counseled Julia on a pro bono basis regarding her community property rights, her rights to receive prompt payment of unpaid wages, and the means to protect her money. Cominos Decl. ¶ 7. Julia then deposited her money into Plaintiff's firm account. *Id.*

These facts shed new light on the allegations in the MacDonald Complaint. At bottom, the MacDonald Complaint alleges that Julia misappropriated millions of dollars from MacDonald's business and personal accounts. *See* MacDonald Compl. ¶¶ 17, 22–31. Plaintiff's conversation with Defendant demonstrates that Plaintiff may have *directed* Julia to take some of these funds because she was legally entitled to them. *See* Cominos Decl. ¶¶ 6–7. That is, Plaintiff's provision of legal services may have brought about some of the actions underpinning the MacDonald Complaint. In this light, the allegations regarding Julia's diversion of funds to Plaintiff's law firm account and the property management company partially owned by Plaintiff support Plaintiff's contention that he told Defendant he was involved in Julia's decision-making processes regarding the funds, including her deposit of funds into Plaintiff's law firm account. MacDonald Compl. ¶¶ 5–6, 31. As a result, the claims for at least professional negligence, civil conspiracy, and violation of the UCL could potentially "aris[e] from" Plaintiff's counselling of Julia. *See id.* ¶ 37 (defendants, including Plaintiff, "breached their duties of care by failing to adequately manage and/or safeguard Plaintiffs' financial affairs"); *id.* ¶ 107 (Plaintiff "agreed with each other Defendant and intended that some and/or all of the wrongful acts set forth in this Complaint occur and be accomplished"); *id.* ¶ 125 (Plaintiff engaged in unlawful business practice by "facilitating

and conspiring with Julia Cominos, in the misuse of [MacDonald's] personal and business funds and lines of credit"). Importantly, the question is not whether MacDonald's claims had merit, but rather whether they triggered Defendant's duty to defend under the Policy. *See Nichols v. Great Am. Ins. Companies*, 169 Cal. App. 3d 766, 776 (1985) ("The duty to defend under the policy exists even if any of the allegations of the suit are groundless, false, or fraudulent." (citation and internal quotation marks omitted)).

Defendant understandably focuses on the allegations of the MacDonald Complaint to argue that there is no connection between the complaint and Plaintiff's rendering of professional services. Instead, Defendant argues, the complaint deals only with the alleged unlawful diversion and receipt of funds. *See* Def. Mot. at 13–15. But this argument ignores the extrinsic evidence clearly linking Plaintiff's provision of legal services to the alleged unlawful diversion of funds in the complaint. For this same reason, Defendant's argument that the complaint alleges, at most, that Plaintiff acted as a business agent, not as an attorney, is unavailing as it is premised solely on the allegations in the MacDonald Complaint and ignores the extrinsic evidence known to Defendant at the time Plaintiff first tendered the defense. *See id.* at 14–15 (citing cases). When considering the legal advice Plaintiff provided to Julia in the light most favorable to Plaintiff, Defendant's cited cases make clear that a reasonable jury could conclude that the type of counsel Plaintiff provided to his daughter regarding her community property rights and her rights to unpaid wages falls within the definition of professional legal services. *See Tana v. Professionals Prototype I Ins. Co.*, 47 Cal. App. 4th 1612, 1619 (1996) ("In bargaining for a malpractice insurance policy, Tana could legitimately expect that he would be covered for acts or omissions in the course of *representing his clients.*"); *Colony Ins. Co. v. Fladseth*, 2013 WL 1365988, at *9 (N.D. Cal. Apr. 3, 2013) (noting that courts "recognize[] a distinction between skills or knowledge specific to the profession, and administrative tasks, such as billing, inherent to all businesses, and have found that the latter is not encompassed with these terms"). Someone "lacking legal knowledge and skill" could not have provided such counsel to Julia. *Fladseth*, 2013 WL 1365988, at *8 (citation omitted).

As to the extrinsic evidence, Defendant raises at least six reasons why, in its opinion, the

extrinsic evidence of Plaintiff's pro bono representation of Julia did not trigger the duty to defend. *See* Def. Mot. at 15–18.  None of its reasons is persuasive.

First, Defendant argues that because the MacDonald Complaint does not reference any legal representation by Plaintiff, Plaintiff was merely "speculating about extraneous 'facts' regarding potential liability or ways in which the third party claimant might amend its complaint at some future date" when he tendered his offer.  Def. Mot. at 16 (quoting *Gunderson*, 37 Cal. App. 4th at 1114).  But, as discussed above, Plaintiff was not speculating about facts that could underpin claims MacDonald did not bring.  *Cf. Friedman Prof. Mgmt. Co. v. Norcal Mut. Ins. Co.*, 120 Cal. App. 4th 17, 35 (2004) (finding no duty to defend because plaintiff speculated about a potential claim based on "made up facts"; "[t]here ha[d] been no allegations, or facts ever presented to or learned by the insurer" that could underpin the claim (emphasis omitted)).  Instead, Plaintiff's evidence tied directly to MacDonald's Complaint and the claims he actually brought, including for professional negligence and civil conspiracy.  Specifically, Plaintiff's provision of legal representation to his daughter arguably led to the alleged actions, including the mishandling of MacDonald's funds at issue in the professional negligence claim.  *See* MacDonald Compl. ¶¶ 34–39.

Second, Defendant in its motion argues that the extrinsic evidence was not known to it at the inception of the lawsuit because Defendant relies only on Plaintiff's attorney's communications with Defendant in late-2017, as opposed to Plaintiff's discussion with Defendant's claim representative at the time of tender in February 2016.  Def. Mot. at 16.  However, the 2016 phone call evidence cannot be ignored (and is not subject to a meritorious evidentiary objection) and constitutes extrinsic evidence known to the insurer at the time of tender.  *See Gunderson*, 37 Cal. App. 4th at 1114 ("[E]xtrinsic facts which may create a duty to defend must be known by the insurer at the inception of the third party lawsuit . . . .").

Third, Defendant argues that Plaintiff never provided evidence to Defendant of his pro bono representation of Julia except in the form of his counsel's letters, which cannot trigger a duty to defend.  Def. Mot. at 16–17 (citing *Hurley Constr. Co. v. State Farm Fire & Cas. Co.*, 10 Cal. App. 4th 533, 538 (1992); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Siliconix Inc.*, 726 F.

17

United States District Court
Northern District of California

Supp. 264, 272 (N.D. Cal. 1989)). Again, Defendant ignores Plaintiff's proffer of his own description of his representation at the time of tender. Defendant does not argue that Plaintiff's own representations to the insurer cannot trigger a duty to defend.

Fourth, Defendant argues that Plaintiff's claim that he represented Julia is contradicted by his deposition testimony in the MacDonald Action, given on April 10, 2017, in which he said that he did not represent Julia as a lawyer. *See* Def. Mot. at 17 (citing Foy Decl., Ex. 3 at 42, ECF 28-2). While Plaintiff's testimony is relevant to the inquiry here, determining whether Plaintiff actually provided pro bono representation to Julia as defined by the Policy is a disputed issue of fact. Plaintiff's testimony that he never represented Julia as a lawyer was not given in a context that would allow the Court, as a matter of law, to map Plaintiff's actions onto the requirements of the Policy, particularly because the Policy does not clearly define "pro bono representation." The scope of the "pro bono representation" clause of the Policy and the question of whether the Policy covered Plaintiff's actions towards Julia is thus a question of fact, the resolution of which is not appropriate at summary judgment. *See Anderson*, 477 U.S. at 254.

Fifth, Defendant argues that Plaintiff does not satisfy the Policy's requirement that Plaintiff performed legal and consulting services for which "remuneration for such services . . . inure[d] to [his] benefit." *Id.* at FREEDOM_PROD_000019. Because Plaintiff provided pro bono representation for which he did not receive monetary compensation, the argument goes, he did not receive the required remuneration. Def. Mot. at 13, 17. Though the Policy covers "pro bono representation," Defendant argues that with respect to pro bono representation the Policy contemplates remuneration in the form of statutory and judicially-awarded fees. *See id.* at 17 & n.3. While this argument is appealing, it is nowhere made clear in the Policy, and Defendant cites no case law to support such a reading. At best, the Policy is ambiguous as to whether pro bono representation requires remuneration, as such a requirement contravenes the ordinary understanding of "pro bono representation." Where the Policy's language is "ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it"—that is, the Policy protects "the objectively reasonable expectations of the insured." *Bank of the West*, 2 Cal. 4th at 1264–65; *see also Hudson Ins.*, 624

F.3d at 1267 ("Any ambiguity in the insurance policy, including in the exclusions, must be resolved in favor of finding coverage."). A reasonable jury could conclude that a reasonable insured would understand the Policy to cover pro bono representation for which the insured does not receive monetary payment.

Sixth, Defendant argues that the extrinsic evidence does not create a duty to defend because it is "factually and legally untethered from the [MacDonald] Complaint." Def. Mot. at 18 (quoting *Storek v. Fid. & Guar. Ins. Underwriters, Inc.*, 504 F. Supp. 2d 803, 812 (N.D. Cal. 2007), *aff'd*, 320 F. App'x 508 (9th Cir. 2009)). This argument is simply a repackaged version of the argument that Plaintiff's extrinsic evidence relies on mere speculation as to what MacDonald might have pled. As discussed above, a reasonable jury could conclude that Plaintiff's evidence underpins some of the allegations and claims in the MacDonald Complaint.

Defendant makes one final argument with respect to the Policy's coverage: it argues that the MacDonald Complaint does not allege "*loss* arising from a claim . . . for any actual or alleged covered act." *See* Def. Mot. at 19–20 (quoting Policy at FREEDOM_PROD_000012–13). Under the Policy, "loss" is defined to include "damages, judgments, settlements, client notification and consultant costs, and defense costs which you are legally obligated to pay," but does not include, as is relevant here, "reimbursement, disgorgement . . . return of fees, costs, or expenses, . . . or matters which may be deemed uninsurable under the law pursuant to which this policy is construed." *Id.* (quoting FREEDOM_PROD_000018). Defendant argues that (1) "claims for recovery of amounts wrongfully acquired," punitive damages, civil penalties, and injunctive relief are uninsurable as a matter of California insurance law; (2) MacDonald's claims premised on disgorgement and emotional distress damages are explicitly exempted from the Policy's definition of "loss"; and (3) MacDonald's blanket claim for general damages is insufficient alone to constitute loss. *See.* Def. Mot. at 19–20.

Defendant's cited case law makes clear that the fundamental question to distinguish "loss" damages from "recovery of amounts wrongfully acquired" is "whether the claim seeks to recover *only* the money or property that the insured wrongfully acquired." *Unified W. Grocers, Inc. v. Twin City Fire Ins. Co.*, 457 F.3d 1106, 1115 (9th Cir. 2006) (emphasis added). Here, as in

19

*Unified W. Grocers*, the "allegations and asserted claims in the Underlying Complaint do not necessarily restrict all potential recovery to restitution." *Id.* MacDonald alleges that "Julia, along with her co-defendants, have caused an estimated $18,000,000 in damages," MacDonald Compl. ¶33, which is not clearly attributable only to funds Julia allegedly misappropriated, *see id.* ¶¶ 23–33 (describing loss in earning for MacDonald's companies and fraudulent selling of assets). Moreover, under the receipt of stolen property claim, MacDonald does not seek merely restitution, but also "damage[s] in an amount to be proven at trial," *id.* ¶ 95, while the civil conspiracy claim states that "[e]ach Defendant bears personal financial responsibility for the actions of all Defendants and the harms and damages inflicted thereby," *id.* ¶ 109. The prayer for relief confirms the request for general damages and restitution, separately. *Id.* at Prayer ¶¶ 1, 3. Given this context, the Court finds that there is a genuine issue of material facts as to the extent the MacDonald Complaint sought loss contemplated by the Policy.

Based on the foregoing, a reasonable jury could conclude that the Policy potentially covered some of the MacDonald claims.

### b. The Policy Did Not Expressly Exclude All of the Claims in the *MacDonald* Action

Defendant also argues that if the Policy can be read to cover the claims of the MacDonald Action, two exclusions from the Policy eliminate the potential for such coverage here. Def. Mot. at 21–22; *see Atl. Mut. Ins. Co. v. J. Lamb, Inc.*, 100 Cal. App. 4th 1017, 1038–39 (2002). First, the "Business Enterprise Exclusion" excludes "a covered act committed by you in connection with any business enterprise which is not the named insured if, at the time of such covered act any of you, had a controlling interest in such business enterprise." Policy at FREEDOM_PROD_000021. Second, the "Trust Exclusion" excludes "activities performed by you in connection with a trust or estate if you are a beneficiary or distributee of the trust or estate." *Id.* Defendant argues that the MacDonald Complaint's allegation that Julia diverted funds to the property management company partially owned by Plaintiff and to the Trust are covered by these exclusions. However, even if that is correct, Plaintiff's extrinsic evidence demonstrates that Plaintiff's representation of Julia, not his role in the property management company or Trust, could have independently triggered the

duty to defend. As such, at least some of Plaintiff's actions, and the claims potentially related to them in the MacDonald Complaint, may not be covered by these exclusions.

Thus, because there are disputed issues of material fact as to whether the Policy covered the claims in the MacDonald Action, summary judgment is not appropriate on the breach of contract claim.

## B. Breach of the Implied Covenant of Good Faith and Fair Dealing

Defendant also moves for summary judgment on Plaintiff's "bad faith" claim, arguing that Plaintiff cannot demonstrate that Defendant's failure to defend Plaintiff was "prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act." *Chateau Chamberay Homeowners Ass'n v. Associated Int'l. Ins. Co.*, 90 Cal.App. 4th 335, 346 (2001). To prove this claim, Plaintiff "must demonstrate misconduct by [Defendant] more egregious than an incorrect denial of policy benefits." *Paslay v. State Farm Gen. Ins. Co.*, 248 Cal. App. 4th 639, 652 (2016). Plaintiff presents evidence that he explicitly told Defendant's claims representative that he provided legal advice to his daughter that led to some of the actions alleged in the MacDonald Complaint. *See* Cominos Decl. ¶¶ 6, 7; Ebey Opp. Decl., Ex. F. Yet Defendant refused coverage. When Plaintiff's attorney again raised the issue with Defendant, Defendant still refused coverage, narrowly interpreting the MacDonald Complaint without looking to how the extrinsic evidence might change how the MacDonald Complaint could be interpreted. *See, e.g.*, Grant Decl., Ex. D, at FREEDOM_PROD_000083. Though it is an extremely close call on this issue, the Court cannot say with certainty, given these and related facts, that no reasonable jury would find that Defendant consciously and deliberately refused to defend Plaintiff in the MacDonald Action. As such, summary judgment is not appropriate on bad faith claim.

## C. Punitive Damages

Finally, Defendant moves for summary judgment on Plaintiff's request for punitive damages. Def. Mot. at 23–25. Plaintiff argues that Defendant made fraudulent misrepresentations in its 2016 denial letter and later denials, including by claiming, in various ways, that the MacDonald Complaint did not trigger the Policy. Pl. Opp. at 19–21. Defendant argues that Plaintiff cannot meet his burden to prove by clear and convincing evidence that

United States District Court
Northern District of California

Defendant acted with the malice, oppression, or fraud required to warrant punitive damages. *See* Cal. Civ. Code § 3294. "The same evidence is relevant both to the finding of bad faith and the imposition of punitive damages," but "the evidence in support of the award of punitive damages must satisfy a distinct and far more stringent standard." *Shade Foods, Inc. v. Innovative Prod. Sales & Mktg., Inc.*, 78 Cal. App. 4th 847, 890 (2000), *as modified on denial of reh'g* (Mar. 29, 2000). To demonstrate that punitive damages are appropriate, Plaintiff "must show that the defendant acted with intent or with conscious disregard for the plaintiff's rights." *United Inv'rs Life Ins. Co. v. Grant*, 387 F. App'x 683, 687 (9th Cir. 2010).

Above, the Court held that it was a close question whether a reasonable jury could find that Defendant violated its duty of good faith and fair dealing. For the same reason, Plaintiff has failed to bring forth sufficient—much less clear and convincing—evidence to demonstrate that Defendant's actions satisfy the "far more stringent standard" of acting with malice, oppression, or fraud. Simply put, there is no evidence that Defendant acted "despicabl[y]" so as to warrant a finding of malice or oppression, or that Defendant "intentionally misrepresent[ed], decei[ved] or conceal[ed] . . . a material fact" from Plaintiff so as to constitute fraud. On the evidence presented, no reasonable jury could find that Defendant acted with intent or with conscious disregard for Plaintiff's rights. *Grant*, 387 F. App'x at 687; *see also Celerity Educ. Grp. v. Scottsdale Ins. Co.*, No. CV 17-03239-RSWL-JC, 2019 WL 430497, at *8 (C.D. Cal. Feb. 4, 2019) (denying summary judgment on bad faith claim and granting on punitive damages prayer).

As such, Defendant's motion for summary judgment is GRANTED as to punitive damages.

## V.   ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

1.  Defendant's motion for summary judgment is DENIED as to Plaintiff's first claim for breach of contract and second claim for breach of the implied covenant of good faith and fair dealing. Plaintiff's motion on these issues is likewise DENIED.

2.  Defendant's motion for summary judgment is GRANTED as to Plaintiff's request for punitive damages.

**IT IS SO ORDERED.**

Dated: April 23, 2019

_____
BETH LABSON FREEMAN
United States District Judge